## PRESBYTERIAN CONGREGATION *v.* CARLISLE BANK.

Case lies by the assignee of bank stock, for a refusal by the bank to permit the shares to be transferred to him on the books of the bank.

W. being the owner of forty shares of bank stock, bequeathed them to his four sons. During the minority of one of the legatees, the bank, with notice of the will, permitted the transfer of thirty shares of the stock, by the consent of all the legatees, to a stranger. Under the act of 1824, the bank cannot refuse to permit a transfer of the ten remaining shares, on the ground that a debt is due by two of the sons, who were of full age when the transfer of the thirty shares was permitted.

IN error from the Common Pleas of Cumberland.

*May* 31. Case, for refusing to permit plaintiff to transfer certain shares of bank stock. The case was this: Prior to 1835, Woodburn, who was the owner of forty shares of the capital stock of defendant, died, having devised the interest of his property to his widow during his children's minority, and at her decease, said property was to be equally divided between his four sons. One of these, George W., was the executor of the will, and James C. a legatee, who attained his majority in February, 1837. In 1835, the widow, with the consent of all the children, authorized the ex-

ecutor to dispose of the bank stock, and relinquished her interest therein. The executor then applied for leave to transfer the stock, and the bank directed a copy of the will to be procured; and then refused to permit the transfer until the consent was obtained of those who were security for the notes discounted by the bank, for George, William, and John, three of testator's children. Upon obtaining the consent of the widow and children and the sureties, that the transfer might be made without impairing their liability on the securities, the bank authorized the transfer, which was accordingly made of three-fourths of the shares.

In September, 1837, the widow, James, William, and George, gave a written authority to transfer the stock to the plaintiff. There were at that time ten shares remaining. In January, 1838, the executor assigned these shares to James, with a power of attorney to transfer the same on the books of the bank: and in the succeeding April, James assigned to plaintiff, for value, and exe-- cuted a similar power. Whether the consideration of the assignment, which was a release of certain quit-rents, was executed, did not appear. The refusal of the bank to permit the transfer was then shown. The defendants proved their judgments against George and John to an amount greater than the value of the stock.

The court rejected evidence of an agreement in 1835, between the legatees and executor of Woodburn, that the stock should be divided between them, and that the thirty shares transferred were the shares of George, William, and John; those of James, then a minor, being retained for him.

The court decided, no cause of action had been shown; and this, and the rejection of the evidence, were the errors assigned.

*Watts*, for plaintiff in error.

*Biddle*, for defendant in error.—The declaration sets forth that the executor *agreed* to transfer ten shares of stock to James C. Woodburn; that the latter agreed to transfer the ten shares to the Presbyterian Church, and that the bank refused to permit the transfer. These agreements, as laid, were both *executory*, and the title to the stock remained in the executor, who alone could sustain this action against the bank. By the written request of the bank to permit a transfer, the parties agreed to relieve that institution from the payment of the same to them, so far as *they were individually concerned;* thus leading the bank to suppose that both George and William, who were indebted to the bank, still had an interest in these shares. The bank refused to permit the transfer, on the ground of this in-

debtedness. It is averred in the declaration, that in January, 1838, George *agreed* to transfer this stock to James, and that the latter *agreed,* in April, 1838, to sell and assign it to the church. The church then entered into this agreement, with a full knowledge of the refusal of the bank to permit the transfer in 1837, and of their reasons for the refusal. George Woodburn then had the legal title, and the bank believed he was beneficially interested in this stock. He alone could transfer it, for by the act of 1824, it is expressly made assignable and transferable *on the books of the corporation only.* The matter complained of is the refusal of the bank to permit the transfer; and clearly George Woodburn, James C. Woodburn, and the Presbyterian Church, could not sustain several suits for this one injury; but if the suit be sustained, what is to prevent George, and afterwards James, from maintaining their respective actions. Choses in action are not, in general, assignable at law, so as to give the assignee a right of action in his own name, but he must proceed in that of the assignor; 1 Chit. Pl. 10. So, too, the action for a tort must, in general, be brought in the name of the party whose *legal* right has been affected, and who was *legally* interested in the property at the time the injury thereto was committed; 8 Term Rep. 330; 3 Campb. 417. The executor was the person having the legal title to the stock, and the legal right to call on the bank to permit the assignment to be made; therefore suit should have been brought in his name. But admitting that James C. Woodburn could recover for the refusal of the bank to suffer the executor to assign the stock to him on the books of the corporation, his transfer to the church was invalid for want of such assignment, and was in effect but the transfer of a right of action for a tort. Again, it did not appear that the church had, in point of fact, consummated their agreement with James C. Woodburn for a purchase of the stock, so that he was liable to them for a breach of his contract to transfer, and yet the church, having in their possession and control all they were to give him, seek to maintain this suit, which will afford no bar to an action by James or by George against the bank for the matter complained of. Restrict the right to sue to George, who held the legal title, and then there cannot be more than one recovery for one wrong.

*June* 8. COULTER, J., (after stating the case.)—The eleventh article of the 3d section of the act of 25th March, 1824, which is copied from the act of 1812, is perhaps the most extraordinary and anomalous clause to be found in our statute book. It enacts that

stock shall be assignable only on the books of the bank, under the inspection of the president or cashier, and that in all cases where a stockholder is indebted to the bank, he shall not be allowed to make a transfer until such debt is discharged, thus investing the control of millions of the property of others in a few individuals: property, too, of that description, which, in a trading and commercial community like ours, is as much, or perhaps more, the subject of mutation and transfer, than any other. Secret liens on any kind of property are abhorrent to our laws, because they check the spirit of enterprise and trade, and entrap the unwary. Yet this is a secret lien to all intents and purposes; for who was ever permitted to have an inspection of the books of a bank, except the initiated? An opportunity of knowing the state of the accounts of individuals is interdicted to the legislature itself, by their own voluntary act or charter. The bank officers are constituted judge, jury, and sheriff, for the purpose of enforcing this lien. In all other cases of lien, the property may be sold and transferred without interdict, and the purchaser holds subject to the lien, with the right of contesting it, by showing that it is paid, or rendered invalid by any other means. Not so in cases like the present. The officers of the bank refuse permission to assign, without allowing the purchaser to know the extent, nature, or validity of the alleged lien. Yet this kind of property may be sold by the authority and process of law. The act of 10th June, 1836, authorizes stock owned by any defendant, in any body corporate, to be levied and sold on execution, like other goods and chattels, subject to all lawful claims thereon of that body corporate. We may presume that it was the intent of the legislature that the purchaser at sheriff's sale should receive a lawful title, subject to lawful liens. In the category of a sale by the owner of the stock, the purchaser would doubtless stand upon as elevated grounds as the purchaser at sheriff's sale.

But hard and anomalous as the secret lien may be upon the unwary purchaser, even in market overt, upon change where "merchants congregate," or abroad in the country, it exists, and exists by the highest authority, that of the law-making power; and it must be enforced within its prescribed limits. But let it stop there. Here, in this court, it receives the command, thus far shalt thou go and no farther. The corporation, being the creature of the statute, must stop where the statutory provision stops. And where in the statute does it find the power to sequestrate the stock of one individual to pay the debt of another? Where does it find authority to take the property of a minor and orphan, and of a church,

to pay the debt of an individual whom they have permitted to assign and transfer his own stock? Where do they find a reason for allowing the assignment to Isaac B. Parker, Esq., by George and John, the individuals indebted, and refusing permission to assign and transfer to the congregation, who had honestly paid for the stock, by an individual not pretended to be indebted? The congregation is, by its character and position in society, its ends and purpose, enjoined to eschew lawsuits and strife, and to seek repose, tranquillity, and peace. It is therefore cruel to compel it to follow justice to this court of last resort, if there be no valid or substantial reason for so doing. And what is the reason which the defendants have exhibited? They have shown that George and John were indebted to them, but have exhibited no shadow of claim against James, and yet they sequestrate his stock! Let us examine a moment the pretence upon which this is done. It is alleged that the four brothers were tenants in common of this stock. But what is the language of this will? Why, that it shall be divided among his four sons with justice, share and share alike. And the bank, after it had been divided, allowed the executor to transfer three-fourths; that is, the shares of George, John, and William. Can it be doubted for a moment but that the bank knew of the partition? Would not they naturally inquire into the circumstances, having previously interdicted the transfer altogether? and can it be doubted but that George M. Woodburn, the executor, and William and John, who were indebted to the bank, had given such security as was satisfactory, before the executor was allowed to make a transfer of their shares. But the plaintiff offered to prove, that in May, 1835, the executor, the devisees, and the widow, had made a division, in pursuance of which the stock of William, George, and John was assigned, whilst that of James C., who was then a minor, was retained for him; and this evidence the court rejected, which was a manifest error. The brothers were not partners. Each was entitled to one-fourth, not one-fourth of each share of stock, because it could not be so divided, and the will says it shall be divided; but one-fourth of the forty shares, which could be divided, and, according to the rejected evidence, was divided, and the part of each was ten shares. The shares of stock have no mark upon them; one share is like another, and ten shares in one lot are like ten shares in another lot. When the bank allowed the transfer of three-fourths of the shares to Isaac B. Parker, Esq., it assented to the severance, and, as a matter of necessity, was affected with notice that the other fourth was the property of James, who had no deal-

ings with the bank. The will was before the bank, as appears by its resolutions on the paper-book. The court ought to have permitted the plaintiff to prove that a division was made. The clear intent of the will is, that each son shall get ten shares—so clear that it ought to have put the bank upon inquiry as to the fact of division. But having refused the executor permission to assign, except to Isaac B. Parker, Esq., there was no way of appropriating to each his separate share, save the only mode adopted by the devisees, and which the court would not allow the plaintiff to give in evidence.

The question then occurs, whether the plaintiff was injured by this conduct of the bank? It seemed to be conceded by the counsel for the bank, that the stock might be transferred *aliunde*, for value, so as to give an equitable right to the transferree. We suppose on that point there can be no question, although the words of the act are, that the stock shall be transferred on the books of the *bank only*. Still, however, it is a great convenience to have the transfer on the books of the institution. In that case, there would be no obstacle set up against the right of the holder to vote, and draw the dividends. And in case of forfeiture of charter, or dissolution, the right to the capital would be palpable and legal, and not liable to cavil. The refusal to allow the transfer, therefore, was an injury to the plaintiff, unless the owner of the stock was indebted to the bank; a question which the court withdrew from the jury, and by so doing committed an error.

The counsel for the bank contended that, even admitting the injury to the plaintiff, and that a wrong had been done by the bank, that this suit in its present form could not be sustained: that the action could only be sustained in the name of the legal owner, that is, the executor of the deceased. But what injury has the estate of the dead man sustained, or can it receive, by this refusal? The stock is given by the will to the legatee, and he must look after it himself, or his transferree. What interest has the executor in it? It is of no manner of injury to him. He has given a power of attorney to transfer the stock, and has thus fulfilled his duty. The stock is neither assets in his hands, nor his own property. Who then is injured? who is despoiled of his right? Why, the plaintiff in this suit. He has shown that he paid full value for the stock, and that the bank will not allow him to obtain the benefit of it. It has been assimilated to an action brought on a bond for the use of the equitable assignee; but in fact it has no resemblance to it. When a suit is founded on a chose in action, it must be brought in the name of the legal owner, for the use of the equitable owner.

But that is mere form, for he who holds the equity is the real party; he is liable for costs, entitled to the money when brought into court; and the legal plaintiff would not be allowed by the court to do any act prejudicial to the equity. I would hesitate long before I would overlook the justice of a case, in pursuit of such a technicality. The suit here is not founded on the chose, but is instituted for wrongfully preventing the equitable owner obtaining the legal evidence of title. It is an action for damages on account of a wrong done, and not an action founded on the *contract* between the stockholder and the bank. On that there is no controversy. Has, then, the conduct of the defendant injured the plaintiff with respect to his lawful right? If it has, the law gives a remedy; and this action can be sustained. Since the days of Lord Bacon, who promulgated the idea, banks, then in their infancy, have been odious to the common mind, and by pursuing with steadiness the law of their existence and individuality, they exposed themselves to the keen and deep sarcasm of Burke. The present case is a pregnant instance of the facility with which they bring themselves within the condemnation of whatever is magnanimous, just, and manly in our nature.

Judgment reversed, and a <em>venire de novo</em> awarded.